UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIAS MARIN, et al.,

        Plaintiffs,                     Civil Case No.
                                               10-CV-10866

vs.

                                               HON. MARK A. GOLDSMITH

BLOOM ROOFING SYSTEMS, INC.,

        Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.    Introduction**

Plaintiffs Elias Marin and Rudy Garcia filed this race discrimination suit against their former employer, Defendant Bloom Roofing Systems, Inc., ("Bloom") alleging (i) race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and (ii) race discrimination and hostile work environment under Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 et seq.  Before the Court is Bloom's motion for summary judgment.  Because Marin and Garcia present evidence from which a fact finder could conclude that Bloom's legitimate nondiscriminatory reason for terminating them was pretextual, the motion will be denied as to the discrimination claims.  The hostile work environment claim will be dismissed as time-barred.

**II.    Factual and Procedural Background**

Bloom installs roofs on new and existing commercial buildings.  Its business is organized as follows.  Tom Bloom is the sole owner.  D.E. 22 at 14 (summary judgment motion) (cm/ecf

pagination). Eric Bloom, Tom Bloom's brother, was (until May 2007) the superintendent of Bloom Roofing. Id. at 15. Eric Bloom scheduled assignments for work crews and roofing jobs; every morning the roofers called Eric Bloom to get their work assignments for the day. Id. at 15-16. Bloom employs labor sent from the United Union of Roofers, Waterproofers & Allied Workers, Local #70. Id. at 14-15. This includes apprentices, journeymen, and foremen. Apprentices and journeymen both do roofing work; foremen are journeymen who are paid a premium to see that management directions are carried out on a project site. Id. at 15.

The union's collective bargaining agreement includes a pay scale. In 2008, the pay scale listed in ascending order, seven levels of apprentices (first class through seventh class), one level for journeymen, and two levels for foremen (small crew and large crew). D.E. 22-4 (union pay scale). A journeyman was paid a rate of $26.08 and cost the employer $45.43. Id. An apprentice was paid a rate ranging from $13.37 to $21.96 and cost the employer between $28.47 and $38.31. Id.

According to Bloom, bids for roofing jobs are most often won or lost based on the bid's cost estimate, and labor cost is the most significant variable element of the estimates. D.E. 22 at 15 (cm/ecf pagination). Thus, in order to keep its costs down, Bloom Roofing employs "mostly" apprentice roofers and uses the minimum number of journeymen possible, using journeymen only when their "advanced skills are needed to perform work that apprentices cannot perform." Id.

Plaintiffs Marin and Garcia began working for Bloom in 1996 and 1997, respectively, and were employed there until their termination sometime in March 2008. Id. at 16-17. Marin began in a pre-apprentice position at Bloom. He worked his way through the levels of apprenticeship, and began working as a journeyman for Bloom in 2000. Id. at 16. Garcia, too,

was hired as an apprentice and progressed through all of the apprenticeship levels. Id. at 17. In July 2006 Garcia became a journeyman. Id.

According to Bloom, however, neither Marin nor Garcia possessed the skill set required of a journeyman. In particular, the company makes at least two types of roofs, "EPDM" and "TPO" or "thermal plastic" roofs. Id. at 16. Bloom maintains that between 2003 and 2008 the demand for "EPDM" roofs -- the type of roof that Marin and Garcia knew how to construct – was decreasing, and the demand for TPO roofs was increasing. Id. Bloom maintains that a journeyman was expected to have skills installing TPO roofs, but Plaintiffs did not.[1]

In March 2008, Tom Bloom made the unilateral decision to "send [Plaintiffs] back to the union."[2] D.E. 22-2 ¶ 16. Tom Bloom's affidavit states that he had evaluated Plaintiffs only a month prior and "was aware that their skills were not at a level to justify their journeyman

---

[1] With regard to Marin, the company argues:

> Marin's 2007 Employee Evaluation states that Marin is "very good at EPDM" but needs to be placed in the TPO heat welding training. . . . Similarly, Marin's 2008 Employee Evaluation stresses that Marin needed to know at least two types of roofing systems, that Marin had EPDM skills, but still was expected to know TPO skills. Thus, Marin had still not learned TPO skills, despite being instructed to do so in his 2007 evaluation."

Id. at 16-17 (citations omitted). With regard to Garcia, Bloom states:

> Like Marin, Garcia never developed the required skills of a journeyman. Bloom Roofing completed an Employee Evaluation of Garcia in 2007. On that evaluation, Garcia was told to learn EPDM and TPO, and that he had "3 months to get to a journeyman standard." . . . The 2008 Evaluation is just as explicit: "*Need at least (2) roof systems" and "on bubble - needs skills improvement."

Id.

[2] Defendants do not dispute that "send[ing Plaintiffs] back to the union" – a term not defined by the parties, but apparently denoting a termination – was an adverse employment action.

wages." Id. at ¶15. Tom Bloom states that he replaced Plaintiffs with apprentices "who can do the same work for significantly less money." Id. at ¶ 14.

Plaintiffs contend that they were sufficiently skilled, and instead were terminated due to Bloom's discrimination against Hispanics. Plaintiffs argue that "[a]nti-Hispanic sentiment was a regular part of life at Bloom Roofing." D.E. 24 at 12 (response). They cite numerous examples, including being called "you guys," "fucking dirty beaner," "Mexican Paver Picker Uppers," "dumb Mexican[s]," and "little brown guys." Id. at 13, 16. Among other things, Plaintiffs maintain that they were treated like "labor mutts," and given dirty work-intensive jobs, whereas white roofers were given cleaner, more technical work. Id. at 16-17. They contend that, at times, only white workers were called to do overtime work. Id. at 19. Of particular relevance to Tom Bloom's stated basis for firing them, Plaintiffs maintain that they attended classes and learned how to use a heat welding gun (a necessary tool for installing a TPO roof), yet were not permitted to use the tool on the job. Id. at 18. White apprentice roofers, however, were permitted to use the heat welding gun. Id. Plaintiffs also maintain that they complained to Eric Bloom about the poor treatment they received, but nothing was done. Id. at 14-15.

At some point after Plaintiffs' termination, they filed a complaint with the Equal Employment Opportunity Commission (EEOC). The EEOC terminated its processing of the charge, and at Plaintiffs' request, issued a right-to-sue notice on December 4, 2009. D.E. 1-2 at 2, 3 (notices). On March 4, 2010, Plaintiffs filed suit in this Court, alleging race discrimination under Title VII and the ELCRA, and hostile work environment under the ELCRA. D.E. 1 (complaint). On February 11, 2011, Defendant Bloom filed the instant motion for summary judgment. The Court held a hearing on June 2, 2011.

**III.   Analysis**

  **A.  Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Thus, the facts and any inferences that can be drawn from those facts [ ] must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks omitted).

  **B.  Race Discrimination**

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Similarly, Michigan's ELCRA prohibits employers from "[f]ail[ing] or refus[ing] to hire or recruit, discharg[ing], or otherwise discriminate[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. Laws § 37.2202(a). Claims under the ELCRA involve the same analysis as Title VII claims. Sutherland v. Mich. Dep't. of Treasury, 344 F.3d 603, 614 n.4 (6th Cir. 2003).

"When, as is the case here, a plaintiff presents only indirect evidence of disparate treatment based on race, [courts] analyze the claim under the McDonnell Douglas burden-

shifting approach." Clay v. United Parcel Serv., Inc., 501 F.3d 695, 703 (6th Cir. 2007).[3] Under this framework,

> the plaintiff bears the initial "not onerous" burden of establishing a prima facie case of discrimination by a preponderance of the evidence. To establish a prima facie case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

White v. Baxter Healthcare Corp., 533 F.3d 381, 391-92 (6th Cir. 2008) (citations omitted).

### 1. Prima Facie Case

Bloom does not contest the first three prongs of the prima facie case. Thus, the Court's analysis will focus on the fourth prong: whether Plaintiffs were replaced by a person outside the protected class or treated differently than similarly situated non-protected employees. As plaintiffs do not argue that they were replaced by a person outside the protected class,[4] the sole

---

[3] Although Plaintiffs title a section of their brief "Plaintiffs have shown direct evidence of the discrimination against them," Plaintiffs do not in that section or elsewhere argue that the evidence in this case is direct evidence, as opposed to circumstantial evidence. Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted). The evidence cited by Plaintiffs in the above-mentioned section is statistical information related to how many Hispanic workers were terminated, an argument why Defendant's stated reason for firing the Plaintiffs was pretext, and an argument that Plaintiffs' supervisors were aware of "racial incidents" and did nothing. These are better classified as circumstantial evidence, i.e., "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." Id.

[4] It is not clear exactly who replaced Plaintiffs. Bloom explains that Tom Bloom "decided to hire apprentices from the Union instead of using some journeymen," and that Plaintiffs were

issue is whether Plaintiffs were treated differently than similarly situated non-protected employees.

### a. Only Hispanic Workers Do "Tear Downs"

Plaintiffs cite several pieces of evidence that could support the understanding that Plaintiffs were treated differently than similarly situated non-protected employees. First, they maintain that they were generally required to do roof "tear downs," the messy labor-intensive process of removing an old roof.[5] In contrast, white workers were tasked with the more technical

---

returned to the union and replaced by "apprentices." D.E. 22 at 18 (cm/ecf pagination). Bloom's brief continues, "Tom Bloom then hired Union apprentices, many of whom were Hispanic." Id. Thus, it is unclear how many apprentices replaced Plaintiffs; the race or ethnicity of the specific individuals who replaced Plaintiffs is also unclear. In any case, Plaintiffs do not make any arguments related to being replaced by a person outside the protected class.

[5] As Plaintiff Marin stated at his deposition,

> A: In general I was upset about the fact that I sat home while the people worked when I was qualified to do what they were doing, and why wasn't I able to work. But I said you have a tear-off, and now you have all the Mexicans here working, which I think it was like eight to two, you know, it was like eight Mexicans, two white Caucasians working . . .

In addition, at Marin's deposition, the following exchange took place:

> Q: So what made you think, or makes you think now that it was your national origin or your skin color that's having him select you or others for tear-offs? . . .
>
> A: Because we were always doing it. Always doing it. It's the hard labor and anybody can tear-off. It doesn't take much brains to do that. It's putting the roof back together and making sure that it passes, you know, for the inspector to come in and get the job inspected. So that's where the brains are, some type of brains. . . ."

D.E. 24-4 at 60-61.

Similarly, Plaintiff Garcia stated that he was steadily employed at Bloom "if there was a tearoff, yeah. We never got new construction. [Another foreman] always got the new construction. So that's how I knew, I mean, we was always just labor mutts. We always have the dirtiest jobs. Dave Fountain [Garcia and Marin's regular foreman] had the dirtiest, hardest

and less labor-intensive work of installing new roofs. D.E. 24 at 12 (response brief) (cm/ecf pagination). Plaintiffs cite in particular one instance where Plaintiff Garcia was part of a group of workers consisting of four Hispanics, one African American, and one white worker (whose ride to work was the African American co-worker). The group was assigned to a night crew and required to move "roofing pavers," cement blocks that weigh between 75 and 150 pounds, for the day crew. D.E. 24-3 at 110-113 (Garcia deposition). The day crew, consisting of at least five white workers with the same skills, performed the easier detail-oriented work.[6] In addition, Plaintiffs' supervisor told them that Eric Bloom, the owner's brother and company superintendent, stated that "the Mexicans are good for tearing off the roof, but not for putting it back together."[7] D.E. 24-3 at 97 (Garcia deposition).

Bloom does not respond explicitly to the above evidence for purposes of creating a prima facie case. However, on a chart in Bloom's brief, next to the allegation "Hispanic workers given

---

jobs ever." D.E. 24-3 at 80 (Garcia's deposition). Garcia also stated that Dave Fountain "only sees us as tearoff guys." Id. at 81.

[6] Plaintiffs' brief and Garcia's deposition also references an incident during which Hispanic workers were sent to pick up pavers and were told by the foreman there that Tom Bloom had "said he was going to send me some Mexican paver picker-uppers and you guys are here." D.E. 24 at 18 (cm/ecf pagination); D.E. 24-3 at 134-35. Plaintiffs maintain that there was machinery available to assist with moving the pavers, but that it was not at the job site, and the Hispanic workers were sent instead. Id. It is not clear from the record if this is the same event that is mentioned above in the text.

[7] On a chart in the Defendant's brief, this quote is listed as "inadmissible hearsay." However, at trial, the statement would not be offered for the truth of the matter asserted, that "Mexicans" are not good only for tearing off roofs, not installing them, but rather for the purpose of demonstrating the statement of mind of the owner's brother and company supervisor. To the extent that the Defendant's argument can be construed as being that the statement is problematic as hearsay within hearsay, the speaker was a supervisor for the Defendant, making the statement potentially admissible under Federal Rule of Evidence 801(d)(2) as the statement of a party opponent. See, e.g., Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 928 (6th Cir. 1999). In any case, this specific statement is not necessary to the Court's analysis on this point.

8

harder night-crew assignment," Bloom states that "Plaintiffs do not know who was on the day crew; there is no evidence of the races of the roofers working the day shift." D.E. 22 at 16. To the extent Defendant's chart can be construed as setting out arguments related to Plaintiffs' prima facie case, the Court evaluates this argument.[8]

It is true that Plaintiff Marin was not sure who was on the day crew. D.E. 24-4 at 44 (Marin deposition). However, Plaintiff Marin stated that it was Plaintiff Garcia who made the complaint about this incident. Id. And Garcia clearly stated in his deposition that the day crew was made up of "all Caucasians." D.E. 24-3 at 112 (Garcia deposition). Further, Bloom does not argue that Garcia is incorrect, or otherwise provide the racial make-up of the day crew. Accordingly, Plaintiffs have set out legitimate evidence in support of the fourth prong of their prima facie case.

### b. Hispanic Workers Not Permitted of Use Heat Weld Guns

Second, Plaintiffs argue that, despite having taken classes to learn how to use the heat welding gun, they were not allowed to use the heat guns. In contrast, white apprentice employees (a lower rank than plaintiffs' journeyman status) were allowed to use the heat guns. D.E. 24 at 18 (cm/ecf pagination). The significance of this is that using the heat gun meant easier, less physical, work.

Although Plaintiffs make this argument as to both employees, the evidence cited in support only concerns Plaintiff Garcia. Plaintiff Garcia attended "classes at the shop for heat welding." D.E. 24-3 at 99; id. at 17-25. Even after that, however, Garcia stated at his deposition

---

[8] The Defendant's chart, which gives explanations in response to the specific allegations of the complaint, is inexplicably confined to the "hostile work environment" section of its brief, and not the section addressing discrimination. D.E. 22 at 29-30 (cm/ecf pagination) (Defendant's motion brief). This opinion, favorably to the Defendant, considers the chart content in evaluating the allegations of discrimination.

that he still was not given the opportunity to do heat welding.  Id.; id. at 131.  He was still regarded as a "tearoff guy."  Id. at 26.  In contrast, Plaintiffs contend, younger white apprentice workers were assigned to do the heat welding.  D.E. 24 at 18.  In Plaintiff Garcia's deposition, he names the individuals who were permitted to do the heat welding:

> Q: Do you recall the names of the guys that were doing mostly heat welding at Bloom?
> A: Eric Nelson.  Kevin Fasecas.  There was Tobey.  There was other apprentices that were doing it.  There was apprentices doing heat welding.
> Q: Do you remember the apprentices['] name?
> A: Albert Zamora.  Rod, he's a foreman now.  There was several kids.  Joe, he was doing heat welding.

D.E. 24-3 at 17.  In his deposition, Garcia described being on a job with Joe in Mississippi, where despite the fact that Joe was an apprentice, and that he was "new," Joe was heat welding.  When Garcia asked the foreman on the job if he could heat weld, the foreman responded "No, we ain't got you here for that."  Id. at 18.  Notably this instance where an apprentice named Joe was welding and Garcia was not permitted to weld occurred after Garcia had taken the heat welding training classes.  Id. at 23 ("I took the training classes before that Mississippi job.").

Bloom responds that it is not responsible for training its employees, rather, it was the union's job to teach employees skills.  D.E. 22 at 24 (cm/ecf pagination).  It further argues that Albert Zamora, who did heat welding, was a Hispanic employee, and that Raul Hinojosa, a Hispanic employee "was one of the best skilled journeymen at Bloom Roofing."  Id.  Thus, Bloom argues, it was not responsible for any differences in training between journeymen, and any differences that did exist were not based upon race.

As a preliminary matter, the current record is underdeveloped regarding the race of the younger apprentices who were permitted to heat weld.  Plaintiffs' brief asserts that they were white.  D.E. 24 at 18 (cm/ecf pagination).  Garcia's deposition does not specifically state that

10

Eric Nelson, Kevin Fasecas, "Tobey," Albert Zamora, "Rod," and "Joe" were all white. See id. at 17. (Although, the deposition elsewhere states that the Mexicans were always in the dirt, while others did the "clean work." D.E. 24-3 at 128 (Garcia deposition).) Notably, Defendant maintains (without citation) in its brief that Albert Zamora was Hispanic. D.E. 22 at 24.

Nevertheless, a jury could conclude that Plaintiff Garcia has presented evidence that he was treated worse than less-qualified non-protected employees with regard to the heat welding issue. First, Plaintiffs do not contend that it was Bloom's job to teach them the heat welding skills. Rather, Plaintiffs argue that once Plaintiff Garcia has been trained, Bloom still would not permit him to do heat welding work. To the extent Bloom argues that Garcia was not sufficiently trained, D.E. 25 at 3 (reply brief), this is a matter of evidence-weighing necessarily performed by a jury. Second, Raul Hinojosa is a non-factor in this argument. Plaintiffs did not cite him as either being able to heat weld or not. And the record appears to be silent on the issue of his heat welding ability. Third, even if Albert Zamora is a Hispanic employee who was permitted to perform heat welding, Plaintiff Garcia has presented evidence of several allegedly white employees of a lower rank than him (apprentice as opposed to journeymen) who were permitted to do this more desirable task. Plaintiff Garcia also has presented evidence that he asked to heat weld and was not permitted. Although the evidence would be bolstered without the additional presence of an employee who is a member of the protected class who, too, received the better treatment, the Court cannot conclude that Plaintiff Garcia has not shown evidence on this issue sufficient to make out a ("not-onerous") prima facie case.[9]

---

[9] Notwithstanding finding the above evidence sufficient to establish a prima facie case, the Court rejects an additional argument by Plaintiffs – that Bloom selected employees to work overtime based upon race. D.E. 24 at 19 (cm/ecf pagination). Plaintiffs' argument does not find support in the record. Although Plaintiffs' brief states that "only white workers had been called for the Saturday jobs and neither [Garcia] nor Marin had been called," neither Garcia's nor Marin's

11

For the foregoing reasons, the Court concludes that a reasonable fact finder could conclude that Bloom treated a comparable (or less qualified) non-protected employee better than Plaintiffs. Plaintiffs have satisfied the fourth prong and made out a prima facie case of age discrimination.

### 2. Legitimate Nondiscriminatory Reason

Bloom argues that it terminated Plaintiffs for the legitimate nondiscriminatory reason that "Plaintiffs' skills were not at a level to justify a journeyman's wage rate." D.E. 22 at 18 (cm/ecf pagination). Bloom argues that owner Tom Bloom decided to hire apprentices from the union instead of using journeymen, and thus returned Plaintiffs to the union and requested union apprentices. Id. Defendant notes that an apprentice cost Bloom about fourteen dollars less per hour than Martin or Garcia. Id. at 6. Bloom also argues that the "business decision to hire apprentices instead of journeymen was very routine" between 2006 and 2010, Bloom had returned a total of 76 journeymen to the union.[10]

Bloom has met its burden to articulate a legitimate nondiscriminatory reason for Plaintiffs' termination.

---

deposition testimony supports that assertion. Plaintiff Garcia does state that with regard to overtime, that he "always felt there was different treatment because of my nationality." D.E. 24-3 at 120. However, in his deposition testimony, he struggles to come up with a specific example, and it is not clear who the individuals were who did get the overtime. See id. at 120-121. Similarly, at his deposition, Plaintiff Marin agreed with the general proposition that white roofers were allowed to work optional overtime that was not offered to Hispanic workers, but was unable to cite a specific example. See D.E. 24-4 at 62-65 (Marin's deposition).

[10] Bloom asserts that "many" of the new apprentices it hired were Hispanic. D.E. 22 at 18 (cm/ecf pagination). It also notes that of the 76 journeymen it has returned to the union in the past, 68 were white, seven were Hispanic, and one was African American. Id. at 6. Further, the company argues, "the number of Hispanic roofers at Bloom Roofing has steadily increased since 2008, both in terms of the total number of Hispanic roofers and their percentage of Bloom Roofing's workforce." Id.

### 3. Pretext

Because Bloom has articulated a legitimate nondiscriminatory reason, the remaining issue is pretext. In the context of a race discrimination claim, the Sixth Circuit has described the standard as follows:

> Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. 1089. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. See Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (citing Manzer, 29 F.3d at 1084).

White, 533 F.3d at 393-394.

Reading Plaintiffs' brief broadly, Plaintiffs make the argument Bloom's rationale is pretextual because it is not believable in light of the remarks concerning Hispanics that company officials made on a regular basis. D.E. 24 at 30 (cm/ecf pagination). Plaintiffs also argue that Bloom's stated reason is not the actual reason and/or has no basis in fact because the economic decisions affected "a disproportionate number of Hispanics [in] the workforce," and "but for Defendant's race[-]based refusal to allow them to develop their skills, they would have had the experience they required." D.E. 24 at 31 (cm/ecf pagination). The Court will consider these points one at a time.

#### a. "Mexican" Remarks by Decision Maker

Although Plaintiffs allege many Bloom employees made objectionable remarks about Hispanic employees, for purposes of this pretext analysis, the relevant comments would be those made by the decision maker, Tom Bloom.

Plaintiffs present two separate pieces of evidence in this vein. First, Plaintiff Garcia states in his deposition that a man who works for Tom Bloom, "Scott," informed Garcia that

Bloom referred to Hispanic workers as "LBG"s, or "Little Brown Guys." D.E. 24-3 at 56, 83. From the same source, Garcia was told that when Tom Bloom sent him and another Hispanic worker on a job to pick up pavers, Bloom called them "Mexican paver picker-uppers." Id. Second, Plaintiff Marin in his deposition stated that Josh Cope, a former office worker of Tom Bloom's, told Marin that Bloom had instructed him to hire some "LBGs" or "little brown guys." D.E. 24-4 at 101-102.

The parties engage in a dispute about the admissibility of the Marin testimony.[11] Plaintiff's counsel concedes in an affidavit that Marin's statement about Cope's statement is likely precluded as hearsay, but states that Cope himself could testify to the evidence. D.E. 24-5 (Joni Fixel affidavit). Counsel states that Plaintiffs have "so far, been unable to depose or question Cope because he was previously unidentified as a potential witness to the racist statements in Bloom's office." Id. Counsel then states that she "will seek an Order" from the Court allowing Plaintiffs to interview or depose Cope; the affidavit also requests that the Court defer decision on the summary judgment motion until Cope has been deposed or interviewed. Id. Bloom argues that counsel's representation that Cope was a recent discovery is "not credible," and opposes "extend[ing] discovery at this late date" or deferring decision on the motion. D.E. 25 at 5.

The Court will not permit any additional discovery concerning Mr. Cope. The Court notes that the discovery deadline in this case was January 28, 2011. To date, Plaintiffs' counsel has not filed any motion seeking an order to extend discovery or otherwise allow the questioning of Mr. Cope. Further, to the extent counsel's affidavit can be construed as such a request, the Court rejects the request. Counsel's representation in her March 2, 2011 affidavit that Mr. Cope

---

[11] Although it is unclear why the parties do not directly argue the same points with regard to the Garcia deposition testimony, the same analysis applies.

was "previously unidentified," is not convincing, given that the deposition in which Mr. Cope's information came to light occurred on October 5, 2010, well before the discovery deadline. See D.E. 24-4 at 3 (showing deposition date of 10/5/10).

With regard to the admissibility of the statement, Plaintiffs all but concedes that the statement is hearsay and raises no argument to the contrary. Accordingly, Plaintiffs have not established the presence of any admissible evidence on this point. See Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment.") The alleged "Mexican" remarks by Tom Bloom cannot serve as pretext evidence.

### b. Disproportionate Number of Hispanics Affected by Economic Decision

The Court also rejects Plaintiffs' second pretext argument – that Tom Bloom's economic decision affected a disproportionate number of Hispanic employees. Even assuming that a disproportionate-impact argument would be appropriate to rebut a legitimate nondiscriminatory reason for the firing of two specific employees, Plaintiffs' argument is thoroughly flawed. The entirety of Plaintiffs' disproportionate argument is as follows. Plaintiffs calculate that because 76 journeymen were fired by Bloom and 7 were Hispanic, approximately 9.2% of the terminated workers were Hispanic. D.E. 24 at 26 (cm/ecf pagination). Plaintiffs compare that percentage with 4%, which Plaintiffs cite as the figure representing the percentage of Michigan's population that is Hispanic. Id. Plaintiffs assert that, therefore, a non-discriminatory force reduction would involve only 4% Hispanics, and because 9.2% is significantly higher, Defendant's practice of sending back journeymen to the union is a pretext for discrimination against Hispanics.

The Court simply notes that without knowing any figures or percentages representing the number of Hispanics actually working at Bloom, there is no statistical representation of the racial

15

background upon which Bloom made its employment decisions. Without at least this data as a starting point, it is impossible to draw any conclusions about disproportionate impact.

### c. Defendants Prevented Plaintiffs from Developing the Necessary Skills

Plaintiffs do not separately develop the pretext argument that Bloom prevented Plaintiffs from developing the necessary skills. D.E. 24 at 31 (cm/ecf pagination). However, Plaintiffs' prima facie evidence that Plaintiff Garcia was prevented from being able to perform heat welding even after being trained fits the argument in that Plaintiff Garcia's evidence could be understood to support the understanding that Defendants prevented him from gaining necessary job experience in heat welding.[12] The Court may consider such evidence for pretext purposes. See Blair v. Henry Filters, Inc., 505 F.3d 517, 533 (6th Cir. 2007), abrogated on other grounds by Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009) (a court may consider evidence a plaintiff presented in support of his prima facie case as evidence for pretext purposes); see also Keck v. Graham Hotel Sys., Inc., 566 F.3d 634, 642 (6th Cir. 2009) (applying Blair in race discrimination context).[13]

A fact finder could conclude that Plaintiff Garcia's evidence that he was not permitted to engage in heat welding while less-qualified non-protected employees were, rebuts one of the

---

[12] At the hearing, Defendants pointed out that Garcia told his new employer that he was "not that good at heat welding." D.E. 24-3 at 16. This fact does not change the analysis because, as Plaintiffs' counsel pointed out, Garcia not being proficient at heat welding is consistent with his account of being trained to heat weld, but not being permitted to do it.

[13] Defendant contends that to show pretext, "the plaintiff may not rely on his prima facie evidence, but must introduce 'additional evidence' of discrimination." D.E. 22 at 10. Defendant relies upon Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) for this proposition. However, the Supreme Court has directly rejected this aspect of Manzer. See Blair, 505 F.3d at 533 ("The Supreme Court's decision in Reeves [v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)] rejected our requirement in Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994), that "the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of . . . discrimination" to prove pretext.)

legitimate nondiscriminatory reasons – lack of skills – that Bloom gave for selecting Plaintiffs for termination.

### d. Other Evidence

In addition to the pretext arguments raised by Plaintiffs, the Court considers the evidence referenced in the prima facie case analysis that Plaintiffs were generally required to do roof "tear downs," while white workers were permitted to install roofs. A factfinder could conclude that this evidence shows that Bloom's proffered reason did not actually motivate Bloom's termination of Plaintiffs. See Blair, 505 F.3d at 532 ("To evaluate whether a plaintiff has created a genuine issue of material fact that the defendant's proffered non-discriminatory reason did not actually motivate the defendant's challenged conduct, we examine the evidence the plaintiff produces to establish a prima facie case, evidence discrediting the defendant's proffered reason, as well as any additional evidence the plaintiff chooses to put forth."). For example, a factfinder could conclude that the inequality in the types of jobs the company generally gave to Hispanic roofers versus white roofers meant that the company disfavored Hispanic employees or placed less value on their work. Thus, Tom Bloom's "routine business decision" eliminating two Hispanic roofers may have been based all or in part on a skewed valuation of Hispanic employees' work.

Accordingly, Plaintiffs have presented evidence sufficient to show a genuine issue of material fact as to pretext.[14]

---

[14] Plaintiffs make the alternative argument that they have established race discrimination under the "mixed motive" framework. D.E. 24 at 20-21; see generally, White, 533 F.3d at 400. Because Plaintiffs do not present any new evidence as a part of this argument, and because the McDonnell Douglas analysis is sufficient to establish that the race discrimination claim survives summary judgment, the Court does not separately analyze this alternative argument.

### C.     Hostile Environment

#### 1. Statute of Limitations

As a preliminary matter, Defendants argue that the hostile-environment claim should be dismissed as untimely because it was brought beyond the statute of limitations. Bloom maintains that Plaintiffs' complaint does not include any hostile work environment allegations that occurred after March 4, 2007, the cutoff date for statute of limitations purposes. D.E. 22 at 25-26 (cm/ecf pagination). Plaintiffs respond that incidents outside the limitations period may be presented in order to prove a "longstanding and demonstrable policy of discrimination." D.E. 24 at 27 (cm/ecf pagination).

As Plaintiffs' hostile work environment claim is a state claim, filed pursuant to the ELCRA, a three-year statute of limitations applies. See Mich. Comp. Laws § 600.5805(10); Garg v. Macomb Co. Cmty. Mental Health Servs., 696 N.W.2d 646, 284 (Mich. 2005). Although Michigan previously employed a "continuing-violations" exception to its statute of limitations, see Campbell v. Human Servs. Dep't, 780 N.W.2d 586, 591 (Mich. Ct. App. 2009), the Michigan Supreme Court has since rejected that doctrine. See Garg, 696 N.W.2d at 659. Therefore, under Michigan law, a plaintiff may not bring a claim for events that occurred beyond the three-year period. Id. ("'[T]hree years' means three years. An employee is not permitted to bring a lawsuit for employment acts that accrue beyond this period.").[15] The complaint was filed

---

[15] The Court notes that evidence of injuries occurring outside the statute of limitations is permissible for the limited purpose of serving as "background evidence to establish a pattern of discrimination in order to prove a timely claim." Campbell., 780 N.W.2d at 591-592. In other words, untimely acts may be permissible to support a claim, so long as at least one act did occur within the statute of limitations. Id. However, here, the ten allegations in the complaint that occurred March 2007 or later do not have to do with Plaintiffs' hostile work environment claim. See D.E. 1 at ¶¶ 36-45.

on March 4, 2010. In order to comply with the statute of limitations, then, Plaintiffs must present hostile work environment allegations that occurred after March 4, 2007.

Although the complaint does raise allegations that would be relevant to a hostile work environment claim – like Plaintiff Garcia being told that "you Mexica[ns] always have kni[v]es on you," D.E. 1 ¶ 25 – it does not raise any allegations that occurred in March 2007 or after.[16] (The ten events the complaint does allege that occurred after March 2007 do not have to do with Plaintiffs' hostile work environment claim. See D.E. 1 at ¶¶ 36-45.) Accordingly, this claim is time-barred.[17]

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (D.E. 22) is denied in part and granted in part as follows: denied as to Plaintiffs' discrimination claims under Title VII and ELCRA; granted as to Plaintiffs' hostile work environment claim.

SO ORDERED.

Dated: June 10, 2011                           s/Mark A. Goldsmith
       Flint, Michigan                       MARK A. GOLDSMITH
                                              United States District Judge

---

[16] Some of the allegations (like the knife comment) are undated. However, it is clear that they occurred sometime before March 2007 because the complaint allegations are set out in chronological order. The knife comment apparently occurred sometime between May 2005 and "summer 2005." See D.E. 1 ¶¶ 21, 25, 26. This understanding is reinforced by the fact that Plaintiffs do not argue that any of the hostile work environment allegations occurred before March 2007.

[17] Because the statute of limitations analysis leads to the conclusion that the hostile work environment claim is time-barred, the Court will not address the arguments the parties advance on the merits of the claim.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 10, 2011.

                                              s/Deborah J. Goltz
                                              DEBORAH J. GOLTZ
                                              Case Manager